MORGAN *v.* SOUTHERN RAILWAY COMPANY; and
*vice versa.*

Under the facts proved in this case and all reasonable deductions there-
from, the plaintiff was not entitled to recover, and the court did not err
in awarding a nonsuit.

FEBRUARY 14, 1913.

Action for damages. Before Judge Conyers. Jeff Davis superior
court. November 2, 1911.

*Guerry, Hall & Roberts,* for plaintiff.

*Bennet, Twitty & Reese* and *Dell & Knox,* for defendant.

HILL, J. Morgan brought suit for damages against the Southern
Railway Company, on account of his alleged illegal ejection from
a passenger-train of the defendant by its employees. After the
plaintiff had closed his case, the defendant moved for a nonsuit,
which was granted by the court, and to this ruling the plaintiff
sued out the main bill of exceptions. Under the pleadings and the
evidence in the case, we think the court did not err in sustaining
the motion. The ruling complained of involves mainly the "in-
terchangeable mileage contract," so called, issued by the defendant
railroad company to the plaintiff, and the question whether, under
that contract, the latter could have the "mileage pulled" to the
point of destination named, under the facts of this case, from a
non-agency station, if the plaintiff did not "board" the train at the
latter. The plaintiff tendered in evidence the mileage book re-
ferred to by him in his testimony, with the following notices and
contract printed thereon: Under the head of "Notice—Im-
portant:" "Mileage coupons will not be honored for passage on
trains or steamers nor in checking baggage (except from non-
agency stations and from agency stations not open for the sale of
tickets), but must be presented at ticket-office and there exchanged
for continuous-passage ticket, which continuous-passage ticket will
be honored in checking baggage and for passage when presented in
connection with this mileage ticket." Under "Instructions to Con-
ductors": "You will honor coupons from this ticket only when
presented by passenger boarding train at non-agency stations, or
agency stations not open for sale of tickets." Under head of
"Contract": "Regulations.—Coupons from this ticket will not be
honored on trains or steamers nor in checking baggage (except
from non-agency stations and agency stations not open for sale

30

of tickets), but must be presented at ticket-offices and there ex-
changed for continuous-passage tickets, which continuous-passage
tickets will be honored in checking baggage and for passage when
presented in connection with this mileage ticket.  This ticket is
subject to the exceptions, rules, and regulations of each line over
which it reads, with which exceptions, rules, and regulations pur-
chaser hereof must acquaint himself."  Under the head of "Con-
tract and Responsibility":  "In consideration of the reduced rate
at which this ticket is sold, I, the original purchaser, hereby accept
and agree to be governed by all of the conditions printed on this
ticket and on the ticket issued in exchange for coupons from this
ticket."

It will be observed that by the terms and conditions of the above
contract, which the plaintiff testified was dated and was signed by
him, it was good for transportation over the lines of the defendant
company when "presented at ticket-offices and there exchanged
for continuous-passage ticket," and it expressly provided that such
"mileage coupons will not be honored for passage *on trains*, .   .
except from non-agency stations and from agency stations not
open for sale of tickets."  Does the evidence in the record show a
bona fide compliance on the part of the plaintiff with the terms and
conditions of the contract?  The plaintiff testified substantially to
the following effect:  On the morning of the day of his ejection
from the defendant's train he was in Macon, which was an agency
station on defendant's line of road, and "intended going to Jesup,
Ga.," a station also on defendant's line.  He left his home, about
9½ blocks distant from the station, that morning 25 or 30 minutes
before the leaving time of the train, and arrived at the station
something like 9 minutes before the train left.  He approached the
ticket-office where tickets were being sold and exchanged for
"mileage," and found a crowd around the ticket window.  He
waited a few minutes, and seeing from the congregation around
both of the windows that he could not get a ticket, he boarded the
train, which did not leave until 5 or 6 minutes after he was seated
in the car.  Soon after the train left Macon the ticket collector
came in the coach and cried, "Tickets to the bridge."  Plaintiff
offered the ticket collector 50 cents to pay his fare to the railroad
bridge spanning the Ocmulgee river.  It being a drawbridge, all
trains stopped before crossing it—on the north side of the river

when going south, and on the south side when going north. There was testimony tending to show that passengers—principally hunters—were received and discharged at the bridge. Nothing else in the record tends to show that any agency station, or sign of a station, was at the bridge. When the collector arrived at the seat occupied by the plaintiff, the latter held up in his hand 50 cents and said, "Captain, I want to pay my fare or transportation to the bridge." The collector inquired, "Are you going to get off there?" The plaintiff said to him, "Captain, that is a matter of mine, and not of yours." The collector said, "I can not accept your fare to the bridge. Let us be honest with one another; are you going to get off at the bridge?" The plaintiff testified: "I told him that was a business of mine, and not of his. 'I want you to accept my cash fare to the bridge; and if I want to get off, I will get off, and if I do remain on the train, I will ask you to accept my mileage from the bridge to Jesup, Ga.' He said, 'I will not do it; I will not accept your fare,' and passed into the smoker. I intended getting off at the bridge when I left Macon, but I did not intend to stop there. I intended getting off the train at the bridge to see about getting some squirrels, where there are a large amount of them in the Ocmulgee river swamp. I did not get off, because from what had happened on the train I was so nervous and humiliated that I did not think when I got there of getting off the train, knowing that my destination was Jesup, Ga. I did not think of my squirrels any more or transact any business there." After leaving the bridge the collector again demanded fare of the plaintiff, who again tendered 50 cents to pay his fare to the bridge, but the collector would not accept it, and said, "If you will pay your fare to Bullard, your mileage will be good from there." Plaintiff declined to do this. There was no discussion of "agency" or "non-agency" station. Plaintiff offered his cash fare to the bridge, and his mileage from this point to Jesup. When the train left Macon there were 16 or 18 passengers in the coach in which plaintiff was. In addition to the ticket-office at the agency station in Macon, the Southern Railway had a ticket-office up town where "mileage" could be exchanged for a ticket. There is a good deal of evidence as to the ejection of the plaintiff, and conversations between the plaintiff and the conductor as to how this should be accomplished. The plaintiff was finally put off at Hazlehurst. He

made no effort to exchange his mileage for a continuous-passage ticket, at any of the agency stations south of the bridge, or at Macon, so far as the evidence discloses, unless his wait of three minutes near the ticket window in Macon could be so held. A witness for plaintiff testified that at each agency station they came to, the ticket-collector would approach the plaintiff and insist upon his paying his cash fare to the agency station at which they were, and then get off and exchange his mileage coupon for a ticket to Jesup, but that the plaintiff refused in each instance. At Bullard, an agency station, the conductor insisted in a "nice" way and manner, asking him to get off and have his mileage coupon exchanged for a ticket; but he refused to do so.

We have set out at some length the facts as above narrated, which to our mind show that there was no bona fide effort upon the part of the plaintiff to exchange his mileage coupons for a continuous-passage ticket at agency stations, as required by the contract. Nor do the facts bring the case within the exceptions of the contract. The bridge being a non-agency station, could the plaintiff pay his cash fare from Macon, an agency station, to the bridge, and continue his journey from the latter place by having his "mileage pulled" *on the train* from that point to destination? The contract for transportation, which he had signed and secured at a reduced rate, and by reason of which he agreed to be bound by all the conditions "printed on this ticket, and on the ticket issued in exchange for coupons from this ticket," expressly provides that "mileage coupons will not be honored for passage on trains . . (except from non-agency stations, and from agency stations not open for sale of tickets), but must be presented at ticket-office and there exchanged for continuous-passage ticket," etc. The "instructions to conductors" printed on the mileage book of the plaintiff directed them to "honor coupons from this ticket *only* when presented by passenger *boarding* train at non-agency stations, or agency stations not open for sale of tickets." (Italics are the writer's.) Can it be said that the plaintiff "boarded" the train at Bridge? Certainly not literally, nor under the facts of this case constructively. There was no apparent effort to comply in good faith with the terms of the contract. The case of *Georgia R. Co.* v. *Murden,* 86 *Ga.* 434 (12 S. E. 630) cited for the plaintiff, is not controlling. There a passenger had boarded the train at a flag-sta-

tion to go to Augusta. He was informed by the conductor that he would have to pay fare at the rate of four cents per mile, and that he could pay at that rate to the next station where tickets were sold, and get off and board the train again, and could then ride the remainder of the distance at three cents per mile. This was agreed to by the passenger, and he did get off at the next agency station, but he found the office closed and he could not secure a ticket. He again boarded the train and tendered to the conductor three cents per mile, which the conductor declined to take and ejected the passenger. On the trial of the case brought by the passenger to recover damages for his ejection, the jury found that such an agreement was made between the conductor and the passenger; and this court held that the passenger had a right to rely on it, and the conductor had no right to put him off the train because he refused to pay four cents a mile, although the conductor had received instructions to charge four cents a mile. We think the decision in that case was right. The plaintiff in that case had boarded the train at a flag-station, or non-agency station, where tickets were not sold, and from where he could pay his cash fare on the train to the point of destination at the regular ticket rate. But Murden had no opportunity to purchase a ticket either at the original flag-station where no tickets were sold, or at the next agency station, which he found closed. He was therefore clearly within his rights in offering the regular ticket rate for his transportation, for he was on the same footing as of one having bought a ticket. And this court very properly ruled, under the facts of that case, that the plaintiff could not be legally ejected from the train for refusing to pay four cents per mile. Here the plaintiff had a special contract in writing, and he was bound to know all of its terms and conditions. The conductor refused to pull the mileage from a non-agency station, when the passenger had not "boarded" the train there as required by the contract, nor exchanged his mileage at an agency station for a continuous-passage ticket. If the plaintiff rests his case upon the proposition that he could not get a continuous-passage ticket at Macon in exchange for his mileage, why did he not insist upon the conductor pulling his mileage from that point? If he had complied with all the requirements of his mileage-book contract with respect to securing tickets before boarding a train, he would have been within his rights to have

demanded that his mileage be pulled from Macon, if he failed to secure a ticket. If, on the other hand, he relies on the fact of "boarding" the train at the bridge, or on having the rights of one getting on at that place, then his contention as to the crowd at the ticket window at Macon is immaterial. If the plaintiff boarded the train at Macon, an agency station, and, after having tendered the collector his mileage book, gave him no information as to why he had not obtained a ticket at Macon, was it not the duty of the conductor to eject him? He gave the conductor no information on this point; and a reason for not getting a ticket at Macon, which was concealed from the conductor, even if good, could not affect the conduct of the latter. If the plaintiff failed to disclose facts to the conductor which would entitle him to have his mileage pulled on the train, or to make any such claim, which was unknown to the conductor, did he not waive any such right, and the right to have his mileage pulled from the bridge? But we do not think that the evidence shows that the plaintiff was entitled to have his mileage pulled either from Macon or the bridge. He must stand or fall on the terms of his special contract. By those terms—already pointed out—he could not demand to have his mileage pulled as insisted. We think, therefore, that, admitting all the facts proved in this case and all reasonable deductions from them, the grant of a nonsuit was proper. The question of the right of the Railroad Commission to require interchangeable mileage pulled on railroad trains is not involved in this case.

*Judgment affirmed on main bill of exceptions. Cross-bill of exceptions dismissed. All the Justices concur.*